UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                   :
UNITED STATES OF AMERICA,                          :
                                                   :
                   -v-                             :          21 Cr. 499-05
                                                   :
DAVON MIAL,                                        :          <u>OPINION & ORDER</u>
                                                   :
                         Defendant.                :
                                                   :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

  Trial in this case is scheduled to begin on October 17, 2022. On September 27, 2022, the Government filed a motion asking that the Court: (1) close the courtroom to all spectators—save for the defendant's immediate family—during the upcoming testimony of an undercover detective (the "UC") who allegedly purchased drugs from Mial and his criminal associates; and (2) permit the UC to testify under an alias. *See* Dkt. 209. To minimize prejudice to the defendant and the public's right to an open trial, the Government proposes to set up a live audio feed of the UC's testimony to a separate room and work with the court reporters to ensure that a daily transcript of the UC's testimony is made available to the public within 24 hours. *Id.* The defendant does not oppose the motion.

  This decision resolves the Government's motion for partial closure of the courtroom during the UC's testimony. For the reasons that follow, the Court grants the Government's motion in large measure, but with a modification aimed at assuring press access to this aspect of the upcoming trial.

I.  **Background**

A.  **The Indictment**

Mial is charged in a six-count superseding indictment with narcotics trafficking offenses in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 841(b)(1)(C), stemming from his alleged participation in a conspiracy to distribute crack cocaine in the vicinity of Times Square in New York City between December 2019 and August 2021.

B.  **Relevant Factual Allegations[1]**

The Government expects to establish, *inter alia*, the following at trial:

1. Between December 2019 and June 2021, the UC completed a total of approximately 67 hand-to-hand narcotics transactions with members of the conspiracy, including Mial.

2. On approximately 17 occasions, the UC made purchases directly from Mial.

3. On at least four additional occasions, Mial interacted with the UC in furtherance of narcotics sales by others.

4. In total, the UC purchased approximately 59.4 grams of crack cocaine from members of the conspiracy.

Other facts relevant to the pending motion are not disputed. These are:

1. The UC is a member of the Manhattan South Narcotics Unit (the "Unit").

2. The UC has been engaged in undercover operations in the vicinity of Times Square for approximately 15 years.

3. Over the course of the UC's career, the UC has established relationships with various narcotics traffickers operating in and around Times Square.

4. By virtue of the UC's experience and relationships, the UC is well positioned to continue undercover operations into organizations that engage in drug trafficking and related crimes in Manhattan, particularly in Times Square.

---

[1] This statement of facts is drawn from the Government's publicly filed motion for courtroom closure. *See* Dkt. 209. The Court recites these factual allegations solely as context for the pending motion.

2

5. Although most members of the conspiracy who allegedly sold drugs to the UC in this investigation have been arrested, others were not charged and remain at liberty, including one who is allegedly continuing to sell narcotics in the vicinity of Times Square.

6. It is likely that the UC will be back in Times Square purchasing narcotics for the ongoing investigation after testifying against Mial.

7. If the UC's identity became publicly known, the UC's safety during such operations could be jeopardized.

8. Because members of the Unit often conduct joint operations with other undercover agents from the same squad, revealing the UC's identity could also endanger other members of the Unit.

9. Revealing the identity of the UC would also potentially undermine ongoing Unit investigations.

### C. The October 3, 2022 Public Hearing

On September 28, 2022, the Court issued an order scheduling a public hearing to give members of the public and the press an opportunity to comment on or object to the Government's motion. Dkt. 210. On October 3, 2022, the Court held that hearing. No member of the press or public attended. The Court inquired whether the Government had received any *ex parte* comments upon or objections to its motion from members of the public or press. The Government represented that it had not.

## II. Discussion

The Government seeks to limit the extent to which the courtroom is open and available to the public during the UC's testimony, and to permit the UC to testify under an alias.

### A. Courtroom Closure

#### 1. Governing Law

"The First Amendment . . . has consistently been read to provide the public and press a right of access to criminal trials." *United States v. Smith*, 426 F.3d 567, 574–75 (2d Cir. 2005) (emphasis omitted). The Sixth Amendment, in turn, gives a defendant a right to a public trial. *See*

3

*Presley v. Georgia*, 558 U.S. 209, 213 (2010). These rights, however, are qualified. *See Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001) ("Th[e] right to be tried in open court is not absolute.") As the Supreme Court has explained, "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the Government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.*

The Supreme Court has established a four-factor test to determine whether an aspect of a trial may be closed to the public. "[This] test applies whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995); *accord Smith*, 426 F.3d at 575. The factors require that (1) the party seeking to close the hearing advance an overriding interest that is likely to be prejudiced; (2) the closure be no broader than necessary to protect that interest; (3) the trial court consider reasonable alternatives to closing the proceeding; and (4) the trial court make findings adequate to support the closure. *Presley*, 558 U.S. at 213–14 (citing *Waller*, 467 U.S. at 48). These factors are interrelated and are to be considered in tandem: "[T]he gravity of the interest that must be asserted by the state depends on the extent of the closure requested." *Bobb v. Senkowski*, 196 F.3d 350, 353 (2d Cir. 1999).

The extent of the permissible closure turns on factors including "the importance of the testimony rendered during closure, the duration of closure, . . . the relationship of those excluded to the complaining defendant," *id.*, and "whether the public can learn (through transcripts, for example) what transpired while the trial was closed," *Bowden*, 237 F.3d at 129 (citing *Ayala v.*

4

*Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (en banc); and *Herring v. Meachum*, 11 F.3d 374, 379–80 (2d Cir. 1993)). "Special concerns may apply when the spectators selectively barred from the courtroom are the defendant's family members." *Id.* at 132.

### 2. Discussion

The Court now applies the above principles, addressing the interest served by closure, the extent of the closure, and the available alternatives.

***Interest served by closure***: The Second Circuit has repeatedly recognized the safety and effectiveness of an undercover law enforcement officer as overriding interests that may justify a courtroom's partial closure. *See, e.g.*, *Smith v. Hollins*, 448 F.3d 533, 539 (2d Cir. 2006) ("[P]rosecutory powers often have an overriding interest in protecting the safety and efficacy of undercover officers."); *Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002) ("[The] safety of a police officer working undercover surely constitutes an overriding interest."); *Gonzalez v. Quinones*, 211 F.3d 735, 738 (2d Cir. 2000) (courts "may properly order courtrooms closed during the testimony of undercover police officers, in order to protect both the officers' safety and their future effectiveness"); *Bobb*, 196 F.3d at 353–54; *Nieblas v. Smith*, 204 F.3d 29, 33 (2d Cir. 1999); *Brown v. Kuhlmann*, 142 F.3d 529, 537 (2d Cir. 1998). As the Second Circuit, *en banc*, has held:

> The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and the trial judge in each case was amply justified in concluding that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. There is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity. Of course, the defendant himself has an opportunity to observe the officer (a second opportunity, if the defendant is guilty), and might communicate a description of the officer to others, particularly if the defendant is at liberty pending trial. The defendant's right of presence at his trial requires accepting that risk, but the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying. The gravity of the state interest in protecting the secrecy of the officer's identity from casual

5

observers and the likelihood that this interest will be prejudiced by the officer's testifying in open court are both sufficiently substantial to justify the limited closure of the courtroom during the officer's testimony.

*Ayala*, 131 F.3d at 72.

Applying these principles, this Court, in resolving motions for partial courtroom closures, has similarly recognized as "extremely substantial" the Government's interest in safeguarding the identity, and thereby protecting the safety, of working undercover officers. *See United States v. Alimehmeti*, 284 F. Supp. 3d 477, 486 (S.D.N.Y. 2018) (permitting partial courtroom closure during UC testimony in case charging material support to terrorism); *United States v. Urena*, 8 F. Supp. 3d 568, 571 (S.D.N.Y. 2014) (same, in case charging violent crimes by members of Bronx Trinitarios gang).

That interest similarly attaches to the anticipated UC testimony here. To be sure, in *Alimehmeti* and *Urena*, the defendants themselves were charged with offenses sounding in violence. Here, Mial and his alleged coconspirators have been charged exclusively with narcotics offenses, involving sales of crack cocaine. Nonetheless, the association between organized narcotics trafficking and violence is well established. And experience counsels, as the Government urges, that "the UC's safety and life would be in grave danger almost immediately" should the UC's identity become known publicly. Dkt. 209 at 2. This threat extends to the lives of other law enforcement officers who may conduct future joint operations with the UC. *See id.*

The interest served by closure is reinforced by the UC's active and ongoing undercover work in Manhattan. *See id.* at 4. The Government proffers that "the risk . . . to the UC's work [is] especially poignant here where the UC continues to conduct undercover operations in the same small area of Times Square—with some of the same individuals—as happened in this case." *Id.* For obvious reasons, the UC's effectiveness—and that of the UC's colleagues—

6

would stand to be jeopardized were his identity exposed. That is especially so given the Government's factual proffer that "[a]t least one individual . . . who sold narcotics to the UC during the investigation remains at liberty and has continued to engage in narcotics trafficking activity." *Id.* at 2. As this Court has previously recognized, "[a] system of criminal justice that was so inflexible as effectively to require exposure of UCs as an incident to prosecution would soon run dry of UCs, crippling the Government's ability to bring many cases" in drug trafficking and other areas. *Alimehmeti*, 284 F. Supp. 3d at 487–88. The interests in the safety and efficacy of the UC and the UC's colleagues are, the Court finds, compelling interests favoring partial closure.

***Extent of the closure***: The proposed partial closure here would be for the entirety of the testimony of the UC, whose testimony on direct examination, the Government estimates, will last approximately four to six hours.

The Government proposes to take two steps to assure a degree of immediate public access to the content of this testimony notwithstanding the exclusion of the press and public. First, it proposes that an audio feed of that testimony be live-streamed to a different room within this courthouse during the period of partial closure. Second, the Government proposes to make available promptly to the public and the press a copy of the transcript of the UC's testimony.

The Court adopts these recommendations. With respect to the latter, the Court directs that updated transcripts of testimony be made available promptly to the press and public both after the end of the UC's testimony and upon the adjournment of each day in which the UC's testimony was heard, whether or not the UC remained on the stand at the close of the day.

In addition to these steps, the Court directs that the following four steps be taken. Each measure, the Court concludes, will temper the adverse effects of the partial closure while not materially increasing any risk of exposure of the UC's identity.

First, as the Government has agreed is appropriate under the governing case law, the defendant's close family is also to be allowed to attend the trial during the UC's testimony. *See Yung v. Walker*, 468 F.3d 169, 175 (2d Cir. 2006) ("*Waller*'s . . . mandate that the closure be no broader than required to protect the overriding interest at stake necessarily applies . . . to the portion of the public to be excluded. Thus, *Waller* prevents a court from denying a family member's request to be exempted from a courtroom closure order unless the court is convinced that the exclusion of that particular relative is necessary to protect the overriding interest at stake."). Second, to the extent that exhibits are utilized during the UC's testimony, these are promptly to be made available to the press and public, including to those persons observing the trial in a different room of the courthouse. Although the Government does not presently believe that any trial exhibit stands to identify the UC, should such come to light, the Court grants leave to the Government to pixelate or otherwise obscure the images or other identifying characteristics of the witnesses as may appear in videos, photographs, or other such exhibits. Third, with respect to any physical evidence introduced during the UC's testimony, the Government is either to (1) publish images of the physical evidence contemporaneously with the audio feed to those persons observing the trial in a different room of the courthouse; or (2) make available for inspection the physical evidence after publishing notice to the public. Fourth, the Court will permit at least one representative from among the District's press pool to be present for the UC's testimony. This measure is to assure press exposure to visual observations (*e.g.*, of

8

trial participants' reactions) that only a person physically present in court can make. *See Alimehmeti*, 284 F. Supp. 3d at 487.[2]

With these modifications, the partial closure is, in the Court's assessment, narrowly tailored to the needs at hand. The Court's insistence that the means of public access set out above be in place reflects features of this case that, as in *Alimehmeti*, demand especially concerted attention to maximizing public and press access consistent with the interests in preserving the UC's safety and ability to continue in an undercover law enforcement role. In *Alimehmeti*, the Court explained why such means of partial access were necessary:

> First, the UCs' testimony will be central to events at Alimehmeti's trial. In some cases in which closure has been approved to safeguard a UC's identity, the UC's testimony was "merely corroborative" of the decisive trial evidence. *See, e.g., Kuhlmann*, 142 F.3d at 538. Here, in contrast, the Government's case, as shown above, is largely built on Alimehmeti's interactions with the UCs. And while these interactions appear to have been largely if not wholly memorialized on tape, these tapes will presumably be authenticated and played during the UCs' testimony, and that testimony will contextualize and explain the recorded events. Second, the length of the closure sought here is relatively substantial. In some cases in which closure has been approved during a UC's testimony, a single UC has testified, and this testimony has covered only a short period. This Court so noted in approving a partial closure during a UC's testimony, lasting two to three hours, in a violent gang case. *See, e.g., Urena*, 8 F. Supp. 3d at 571 ("The Government proposes to close the courtroom during only the testimony of one witness."). In contrast, here, the closure would cover the examinations of four witnesses, whose combined direct testimony the Government estimates will span a day and a half or two, or fully one-third of its direct case.

*Alimehmeti*, 284 F. Supp. 3d at 487–88.

Here, the same two facets—the centrality and length of the UC's testimony relative to the length of the overall trial—are present. At the October 3, 2022 hearing, the Government forecast that the UC would be the case's "most significant" witness; defense counsel did not disagree.

---

[2] As the Court explained in *Alimehmeti*, the Court has confidence that any reporter whom this District's press corps designates to serve as a pool reporter during the UC's testimony will respect the vital interest in non-disclosure of identifying characteristics of the UC. *Id.*

9

The Government further estimated that its direct examination of the UC could last between four and six hours; defense counsel projected cross examination of commensurate length. With trial estimated to take four days, the UC's testimony thus stands to comprise perhaps one-fourth or one-fifth of the trial's total length.

The alternative modes of access here aim to assure that the public and press, should they prove interested in the trial, be able to fully access it save for reports as to the identity and identifying characteristics of the UC. As the Court explained in *Alimehmeti*:

> The public will be able to hear the audio testimony of the UCs in real time in a courtroom in this building. The public will be able to hear and see, either contemporaneously or nearly so, the exhibits offered and (in the case of tapes) played during this testimony. And the public will have access to, through the reporting of an SDNY press pool member, any visual observations of trial participants noted by the reporter.

*Id.* at 488.

Therefore, under the first two prongs of the *Waller* test, the Court finds that the Government's proposed closure in this case is no broader than necessary to protect the UC's safety and the viability of ongoing NYPD investigations. The Court finds both of these interests to be of overriding importance.

***Alternative measures***: The third prong of the *Waller* test requires the Court to consider reasonable alternatives to closing the proceeding during the UC's testimony.

In its motion, the Government sets out—and dismisses as unappealing—two alternatives to the limited courtroom closure it proposes.[3] Those options are: (1) disguising the undercover officer; or (2) placing a screen between the witness and the courtroom spectators. The Court has

---

[3] In part because the motion is unopposed, the Court has not been offered other alternatives. The Court thus focuses its discussion on those that the Government offered for consideration in its motion.

10

previously considered such alternatives on a motion for partial closure during a UC's testimony. In *Urena*, this Court determined that the disguise- or screen-based "alternatives would be materially more problematic and harmful than the proposal for a partial closure of the courtroom. As the Second Circuit has noted, 'disguising the witness risks lessening the jury's opportunity to observe the witness's demeanor and assess credibility, and a screen risks implying to the jury that the family or friends of the defendant in attendance are likely to be dangerous.'" *Urena*, 8 F. Supp. 3d at 572 (quoting *Ayala*, 131 F.3d at 71–72); *see also United States v. Hernandez*, No. S1 12 Crim. 809 (PKC), 2013 WL 3936185, at *2 (S.D.N.Y. July 29, 2013) (rejecting use of a screen or disguise). The Court, in agreement with the Government, reaches the same conclusion here.

Based on the Court's analysis of the *Waller* factors above, the Government's request to close the courtroom during the UC's testimony—in the limited manner proposed—is, therefore, justified. The Court will permit the UC to testify in a courtroom closed to the public, with the critical qualifications addressed above: that the audio of the UC's testimony is to be live-streamed to a public location in the courthouse; that any exhibits offered or played during the UC's testimony are, to the extent possible, to be made available contemporaneously to the public and press; that images of the physical evidence be made available contemporaneously with the audio feed to those persons observing the trial in a different room of the courthouse, or that the public may, upon request, inspect the physical evidence; that unredacted copies of the UC's testimony promptly be made available to the public and press; that Mial's close family be permitted to attend; and that at least one member of the District's press pool also be permitted to attend the UC's testimony.

11

Accordingly, the Government's motion to close the courtroom in part during the UC's testimony is granted.

### B.  Testimony Under an Alias

The Government seeks an order allowing the UC to testify under a pseudonym, on the conditions that the Government (1) disclose to defense counsel on an attorneys'-eyes-only basis the UC's true name, to enable the defense to investigate potential impeachment material; and (2) promptly disclose to the defense any *Giglio* information it learns about the UC, including any derived from its knowledge of the UC's true legal name. On this proposal, defense counsel would be precluded from using the UC's true name in court or—absent express approval from the Court—providing the UC's true name to anyone else, including any agent of defense counsel (*e.g.*, an investigator) or the defendant.[4]

The Government's proposal implicates the Confrontation Clause of the Sixth Amendment, which guarantees a criminal defendant the right to cross-examine adverse witnesses. *See Smith v. Illinois*, 390 U.S. 129, 129–31 (1968). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (alteration in original)).

---

[4] The Government does not seek to preclude defense counsel from learning the UC's actual name or undertaking appropriate diligence as to the UC (*e.g.*, investigating whether there is public-record impeachment material as to the UC). *See Urena*, 8 F. Supp. at 573 (precluding cross-examination on UC's true name while noting that defense counsel had access to that name and all *Giglio* material associated with the UC); *United States v. Hernandez*, 2013 WL 3936185, at *3 (same); *cf. United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970) (prosecution's offer to provide witness's address to defense counsel privately satisfies confrontation rights and does not prejudice cross-examination).

12

This Court has approved pseudonymous testimony by a UC as a means of protecting a UC's safety and effectiveness, *see Alimehmeti*, 284 F. Supp. at 490–91; *Urena*, 8 F. Supp. 3d at 572–574, as have other courts, *see, e.g.*, *Hernandez*, 2013 WL 3936185, at *3 (testify under alias); *Washington v. Walsh*, No 08 Civ. 6237 (DAB), 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) (testify by badge number); *Alvarado v. Burge*, No. 5 Civ. 1851 (AKH), 2006 WL 1840020, at *2 (S.D.N.Y. June 30, 2006) (testify by badge number); Memorandum and Order, *United States v. Naseer*, 1:10 Crim. 00019 (RJD), at 4–6 (E.D.N.Y. Jan. 26, 2015) (testify under alias). "Such restrictions on testimony are equally reasonable here, particularly insofar as the information that they preclude the defense from publicly eliciting—a UC's identity—is neither exculpatory as to [the defendant] nor evidently relevant at trial." *Alimehmeti*, 284 F. Supp. at 491 (citing *Urena*, 8 F. Supp. 3d at 573 ("Moreover, nothing about [the UC's] real name goes to his credibility or knowledge regarding the subject of his testimony.")). The Court therefore adopts this sensible, and unopposed, proposal.

## CONCLUSION

For the reasons stated above, the Government's motion is granted. The courtroom will be closed to the public—but not to the defendant's immediate family—for the limited period during which the UC will testify, and the UC will be permitted to testify at trial without revealing the UC's true name. The Government is directed to arrange all accommodations promised in its motion, and to give both the Court and the defendant 24 hours' notice of its intention to call the UC to testify.

13

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: October 6, 2022
      New York, New York

14