MAH7MIA1 – CORRECT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        21 Cr. 499 (PAE)

 5   DAVON MIAL,

 6

 7                    Defendant.

 8                                        Trial
     ------------------------------x
 9
                                         New York, N.Y.
10                                       October 17, 2022
                                         9:00 a.m.
11

12   Before:

13
                    HON. PAUL A. ENGELMAYER,
14
                                         District Judge
15
                         APPEARANCES
16
     DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  KEDAR S. BHATIA
          ASHLEY C. NICOLAS
19        MATTHEW J.C. HELLMAN
          Assistant United States Attorneys
20
     LAW OFFICES OF DANIEL A. McGUINNESS, PC
21        Attorney for Defendant
     BY:  DANIEL A. McGUINNESS
22

23   Also Present:
     OWEN FOLEY, U.S.A.O. Paralegal
24   NICHOLAS KIM, Defense Paralegal
     SIMON OTERO, U.S.A.O. Paralegal Intern
25   SPECIAL AGENT ELLIOT RENZ, Homeland Security
```

MAH7MIA1 - CORRECT

1            (Case called)

2            MR. BHATIA:  Good morning.  Kedar Bhatia for the

3    United States, joined by Ashley Nicolas, AUSA, Matt Hellman

4    AUSA, paralegal intern, Simon Otero, and Special Agent --

5            THE COURT:  Sorry.  Let me take this slow.  I know you

6    two.  Next at the table is?

7            MR. HELLMAN:  Matthew Hellman.  Good morning, your

8    Honor.

9            THE COURT:  Good morning.  Okay.

10            MR. FOLEY:  Owen Foley.  Good morning, your Honor.

11            THE COURT:  Good morning.  Okay.  Go ahead.

12            MR. BHATIA:  And Simon Otero is our paralegal intern.

13            THE COURT:  Give me the full spelling.

14            MR. BHATIA:  Simon, S-I-M-O-N, Otero, O-T-E-R-O.

15            And one thing to note about Mr. Otero is I don't think

16    he's on our list of people who you'll see for the government.

17    I think he will be sitting at counsel table and doing some of

18    the witness presentation stuff.

19            THE COURT:  Okay.  So Mr. Otero is an AUSA?

20            MR. BHATIA:  No.  I'm sorry.  He'll be sitting at

21    counsel table and doing the trial director.

22            THE COURT:  I see.  In any event, all five of you at

23    some point or another will be at the table; therefore, I need

24    to identify everybody?

25            MR. BHATIA:  Exactly.

MAH7MIA1 - CORRECT

| | |
|---|---|
| 1 | THE COURT:  Very good.  Welcome to all of you.  You |
| 2 | may be seated. |
| 3 | MR. MCGUINNESS:  Good morning, your Honor. |
| 4 | THE COURT:  Good morning. |
| 5 | MR. MCGUINNESS:  Daniel McGuinness for Mr. Mial.  And |
| 6 | Mr. Mial is to my right.  And to his right is my paralegal, |
| 7 | Nicholas Kim, who will be joining us for the trial. |
| 8 | THE COURT:  Very good.  Good morning, Mr. McGuinness. |
| 9 | Good morning, Mr. Kim.  And, of course, good morning to you, |
| 10 | Mr. Mial. |
| 11 | Government, there's a sixth person over here. |
| 12 | MR. BHATIA:  Yes.  Special Agent Elliot Renz will also |
| 13 | be sitting at the government table during the trial. |
| 14 | THE COURT:  Last name is spelled? |
| 15 | MR. BHATIA:  R-E-N-Z. |
| 16 | THE COURT:  All right.  One moment. |
| 17 | Mr. Bhatia, for the purpose of jury selection, it will |
| 18 | be necessary for you -- you don't have to do it now, but when |
| 19 | people come to the sidebar, they're usually following this |
| 20 | path.  I'm fine and Mr. Smallman is fine, during jury |
| 21 | selection, having all six of you up here.  And it is in some |
| 22 | respects easier, because I have to identify the trial |
| 23 | participants for the jury.  It gets to too congested to have |
| 24 | everybody up here during the trial, so you'll need to have find |
| 25 | out someway of rotating. |

MAH7MIA1 — CORRECT

1          MR. BHATIA:  Understood.

2          THE COURT:  All right.  Very good.

3          Okay.  I've got a handful of items to take up with

4     you.  As to timing, though, Mr. Smallman tells me that because

5     today is a Monday and the jury first needs to get its marching

6     orders—its training session, if you will—we're likely not to

7     have a venire here until after 10 o'clock and potentially after

8     10:30.  We'll see.  It depends where we are in the batting

9     order today, but just in terms of people's expectations.

10          Now, I have a handful of items to take up.  The first

11     one, which I think ought to be brief, is as follows:

12          First, at a recent conference, I allocuted counsel and

13     the defendant about plea offers.  Just to confirm, has any

14     intervening plea offer from the government been made to the

15     defense?

16          MR. BHATIA:  We have not made any plea offer.

17          MR. MCGUINNESS:  Your Honor, I'd like to make a record

18     about some conversations that happened since that last plea

19     conference.  Specifically on that day, there were conversations

20     in this courthouse, and then by telephone, between myself and

21     the prosecutors in which it was told to me that there was an

22     option for my client to plead to the (b)(1)(C).  This past

23     Thursday, my client sought to avail himself of that offer, and

24     I was told that that offer had evaporated without it being told

25     to me that that offer would be going away.  So we will be going

MAH7MIA1 - CORRECT

1    forward with trial.

2            THE COURT:  All right.  Look, the reason I'm

3    inquiring, of course, is to make sure that the defendant, if

4    there was a plea offer on the table, was notified of it and

5    made the decision, as opposed to counsel making the decision

6    for the defendant.  What you're telling me, essentially, is the

7    opposite, which is that late in the day at some point last week

8    your client expressed an interest in pleading guilty to a

9    (b)(1)(C), but that no such offer, you were informed, was on

10   the table.

11           Do I have that right?

12           MR. MCGUINNESS:  That is correct.

13           THE COURT:  Government, anything to say in response?

14           MR. BHATIA:  That conversation did happen on Thursday

15   where defense counsel indicated an interest in a (b)(1)(C) plea

16   offer that we had previously extended in August.  We extended

17   that offer in writing on August 24; it expired on August 29.

18           THE COURT:  I'm not getting in the middle of plea

19   negotiation, but I take it, by some written term, the deadline

20   for its expiration was set out for the defense?

21           MR. BHATIA:  That's right.  There was a deadline that

22   was in late August.  To the extent we had conversations about

23   perhaps having more conversations about a plea, we never, ever

24   would leave open an offer like that indefinitely until the

25   Thursday before trial to be accepted whenever the defendant

MAH7MIA1 - CORRECT

1    wants.  So, I don't accept the characterization from defense

2    counsel, just so there's a perfectly clear record.

3        THE COURT:  I don't think defense counsel is

4    representing that the government had left open the offer after

5    the expiration date that you had given.  I think defense

6    counsel is disappointed that the offer wasn't reopened.

7        Let me finish with Mr. Bhatia.  But go ahead,

8    Mr. Bhatia.  I cut you off.

9        MR. BHATIA:  I don't have anything more to add, your

10    Honor.

11        THE COURT:  All right.  Mr. McGuinness, you're rising.

12        Was there a deadline set for the expiration of the

13    plea offer in writing?

14        MR. MCGUINNESS:  There was, your Honor.  And it was to

15    my surprise both that on the date of the final pretrial

16    conference and subsequent to that, the government indicated to

17    me that he could still take the (b)(1)(C), that would be

18    available to him.

19        THE COURT:  Mr. Bhatia, again, I need to make a record

20    here.  Following the expiration of the written plea offer on

21    the date indicated, Mr. McGuinness indicates there were oral

22    conversations that suggested to him that a (b)(1)(C) might

23    still be attainable.

24        MR. BHATIA:  Your Honor, I do recall speaking with

25    defense.  There might have been discussions orally around the

MAH7MIA1 - CORRECT

1    time of that initial August 24 plea offer and when it elapsed

2    on August 29 to give some modest extension until, perhaps, the

3    final pretrial conference in that case.  I don't remember if we

4    had -- it would have been an extension of a few days, not an

5    extension until August.  And then at the final pretrial

6    conference, it was conclusive on the record, rejected, we're

7    going to trial.

8              THE COURT:  Let me put it this way.  Since the final

9    pretrial conference——because we had closure at that point——have

10   there been discussions in which the government indicated to

11   defense counsel that the (b)(1)(C) offer might in effect be

12   reopened?

13             MR. BHATIA:  No.  And there were no discussions about

14   what the terms of a new offer might be on a new date.  Those

15   terms might change very much.  A plea offer extended on

16   August 24 might not be the same one that we could enter into in

17   good faith on the Thursday before trial.

18             THE COURT:  I take it, in part, because as the

19   government's trial preparation goes on and the investigation

20   continues, the known facts or the reasonably establishable

21   facts may change.

22             MR. BHATIA:  Precisely.

23             So to the extent we -- by the time of the final

24   pretrial conference, there were no other negotiations

25   afterwards.

MAH7MIA1 - CORRECT

1           THE COURT:  For the record, the final pretrial

2  conference was two weeks ago today, October 3.

3           MR. BHATIA:  That's right.

4           THE COURT:  So in the last two weeks there's not been,

5  even orally, a reopening of an earlier plea offer or a

6  communication, even orally, of a new one?

7           MR. BHATIA:  One moment, your Honor.

8           (Counsel conferred)

9           MR. BHATIA:  Your Honor, I don't have the dates of our

10  oral conversations.  There were conversations about the terms

11  of a separate type of plea.  And I don't recall if those were

12  before the final pretrial conference or after the final

13  pretrial conference, but it was a plea that would not be to one

14  (b)(1)(C) to resolve the whole case.  It was a different type

15  of plea offer --

16           THE COURT:  Mr. McGuinness.

17           MR. BHATIA:  One more moment, your Honor.

18           -- which we rejected.  We said that plea offer we will

19  not entertain.

20           THE COURT:  Okay.

21           MR. BHATIA:  Or that plea offer we will not extend.

22  So in terms of a different plea, we said we would not extend.

23           THE COURT:  In other words, there were some

24  discussions in this space, but the relevant issue is, did the

25  government since the final pretrial ever offer a concrete

MAH7MIA1 - CORRECT

 1    plea -- make a concrete plea offer to the defense?

 2                MR. BHATIA:  No.

 3                THE COURT:  Okay.  Mr. McGuinness, understanding there

 4    were discussions of some sort, is it correct that after the

 5    final pretrial conference, the government never made a firm

 6    offer as opposed to having discussions?

 7                MR. BHATIA:  Your Honor, I would say there's no

 8    written offer; certainly, I would concede that.  I would

 9    definitely characterize the discussions we had quite

10    differently.  And what your Honor suggested and what AUSA

11    Bhatia has suggested is, firstly, consistent with everything

12    I've seen in the cases in my many years.  In the many years

13    I've been doing this, what they do in cases is there's an

14    expiration date.  And after that date, the plea offers get

15    worse, not better.  It is not consistent, however, what

16    happened here.  After the final pretrial conference, it was

17    indicated to me that he had a (b)(1)(C) option on the table.

18    And there was a discussion about --

19                THE COURT:  Were the terms of that (b)(1)(C)

20    option—for example, the guideline calculation—communicated to

21    you at that time?

22                MR. BHATIA:  We had a lengthy conversation in which I

23    attempted to move the government to a lower guidelines

24    calculation.  They indicated to me numerous times that they

25    were open to hearing arguments for a lower guidelines

MAH7MIA1 - CORRECT

1     calculation.  They were flexible on that.  Ultimately, I didn't

2     prevail.  At the end of the conversation and throughout, they

3     stuck with the initial guidelines calculation that they've been

4     at the entire time.  It certainly didn't go higher.  Of course,

5     the point for a timely acceptance of responsibility would not

6     be given to Mr. Mial.

7            THE COURT:  I mean, it sounds to me as if you're

8     saying the government orally indicated that there were terms

9     under which a (b)(1)(C) might be attainable, but you weren't

10    able to reach a meeting of the minds on those terms.

11           MR. MCGUINNESS:  That's correct, your Honor.

12           THE COURT:  Look, the relevant issue, as you know, for

13    me is at this point to make sure that any plea offer was

14    conveyed to the defendant.  It does not appear as if any --

15    insofar as the one offer that was made in writing had expired,

16    it does not appear to me as if a firm alternative offer was

17    made.  Rather, it sounds to me as if—consistent with practice

18    in many cases—discussions remained open, but they never got

19    the "yes."  You tell me.  Otherwise, we have a little bit of an

20    issue here.  I want to get it resolved now so we don't have a

21    needless 2255 at some future point.

22           MR. MCGUINNESS:  No.  I believe as you just said it,

23    your Honor, that's correct.

24           THE COURT:  Okay.  In other words, to be very direct,

25    there was no firm, binding, all terms set out, specific plea

MAH7MIA1 - CORRECT

1   offer made to you, but there were discussions in that space,

2   but they never got to that point?

3           MR. MCGUINNESS:  Your Honor, if there was an offer on

4   the table -- I'm sorry, your Honor.  I don't mean to quibble.

5   But the "firm, binding" part of it, orally, I don't want to say

6   the wrong thing.

7           My understanding and my impression from the

8   conversations was that my client, had he said yes, would be

9   given that offer.  I conveyed that to my client.  My client, on

10  Thursday, indicated he would like to take that offer, and then

11  I was told it was too late.

12          THE COURT:  Well, the bottom line is your client, from

13  the defense perspective, was the decision-maker here, correct?

14          MR. MCGUINNESS:  Yes, your Honor.

15          THE COURT:  In other words, there may or may not be a

16  dispute between the two of you as to whether some new offer was

17  made, but even if it was—taking your view of things—your

18  client—as opposed to you—decided how to proceed, and then the

19  government clarified that, from its perspective, there was no

20  such offer on the table.

21          Is that right?

22          MR. MCGUINNESS:  Yes.

23          THE COURT:  Okay.  Look, we have here a difference of

24  view as to whether the government conveyed an offer to the

25  defense.  At the end of the day, from experience, these are

MAH7MIA1 - CORRECT

1    usually put in writing, as the original offer was.  It's not

2    common, in my experience, that the government characterizes

3    something verbal as ultimately a firm plea offer.  Often, those

4    written offers are preceded by verbal discussions.  But the

5    relevant issue, from my perspective, is who the decider was at

6    the defense table.

7            Mr. McGuinness, did you faithfully convey your

8    understanding of the government's position, whether it was

9    right or wrong, at all times to your client?

10           MR. MCGUINNESS:  Yes, I did.

11           THE COURT:  And did you, each time, convey to the

12   government client's position?

13           MR. MCGUINNESS:  I did.

14           THE COURT:  And when was it that you say your client

15   indicated that he was interested in accepting terms of a plea

16   offer that you believed was on the table?

17           MR. MCGUINNESS:  It was this past Thursday, your

18   Honor.

19           THE COURT:  Okay.  And what were the terms that you

20   told your client you believed an offer consisted of?

21           MR. MCGUINNESS:  It would be the same as the written

22   plea offer but he would not get credit for the timely

23   acceptance, that one guidelines point.

24           THE COURT:  And who was it from the government that

25   told you orally, in your view, that told you that an offer

MAH7MIA1 - CORRECT

1    consistent with the earlier offer, with only a change of one

2    point in the offense level due to the elimination of the third

3    acceptance point, who was it that told you there was a firm

4    offer available on those terms?

5              MR. MCGUINNESS:  Well, your Honor, the conversation

6    was with AUSA Bhatia.

7              THE COURT:  Where were you when you had that

8    conversation?

9              MR. MCGUINNESS:  I was in my office on the telephone.

10             THE COURT:  And then you spoke to your client?

11             MR. MCGUINNESS:  Yes.

12             THE COURT:  And your client said, On second thought,

13   I'll take that offer?

14             MR. MCGUINNESS:  It was days later, but yes.

15             THE COURT:  So Thursday was the 13th?

16             MR. MCGUINNESS:  I'm sorry, your Honor.  I think I was

17   a bit confused.  But the conversation I had with AUSA Bhatia

18   was on the date of the final pretrial conference.

19             THE COURT:  I'm sorry.  So that was on the 3rd?

20             MR. MCGUINNESS:  Yes.

21             THE COURT:  So you're saying you had a phone

22   conversation with AUSA Bhatia after the final pretrial

23   conference, after I allocuted you and your client about plea

24   offers?

25             MR. MCGUINNESS:  Yes.

MAH7MIA1 — CORRECT

1          THE COURT:  At that time, AUSA Bhatia, you say said to

2     you, The old offer stands, save the reduction of the acceptance

3     credit to two points, rather than three; correct?

4          MR. MCGUINNESS:  Yes.  In substance, yes, so my client

5     could resolve the case with the (b)(1)(C) offer.

6          THE COURT:  And you understood that to be a final,

7     firm offer?

8          MR. MCGUINNESS:  I did.

9          THE COURT:  And you conveyed that to your client?

10         MR. MCGUINNESS:  Yes.

11         THE COURT:  Who said to you, at this point, "Yes"?

12         MR. MCGUINNESS:  At that point, it was a no.

13         THE COURT:  It was a no?

14         MR. MCGUINNESS:  And then days later, this past

15     Thursday, it was a yes.

16         THE COURT:  I see.  And when your client said no, did

17     you convey that to AUSA Bhatia?

18         MR. MCGUINNESS:  I did not, no.  I continued to have

19     conversations with my client.

20         THE COURT:  Whatever your understanding was on the day

21     of October 3 when you say AUSA Bhatia reprised the old plea

22     offer with a one-point difference in the offense level, was

23     there a discussion on that day how long that oral offer would

24     remain open?

25         MR. MCGUINNESS:  No, your Honor.

MAH7MIA1 - CORRECT

1              And I will say I did register surprise that this was

2       odd that this offer would be open so late.  This is not the

3       practice of the office for them to extend a (b)(1)(C) offer so

4       close to trial, certainly after I received the 3500 material.

5       But I said there must be some factor that is at play here, and

6       I continued to speak with my client.

7              THE COURT:  The obvious possibility here being that

8       there was some miscommunication between you, and you perceived

9       the offer to be firm and to be perpetual, and AUSA Bhatia did

10      not perceive it that way at all?  I mean, that seems to be the

11      generously put takeaway here.

12             MR. MCGUINNESS:  I can't rule that out, certainly,

13      your Honor.  But I will say it was a fairly substantive

14      conversation about guidelines and around taking that offer.

15             THE COURT:  All right.  I'm just going to inquire of

16      your client whether the series of events you recounted is

17      consistent with what you told him.

18             MR. MCGUINNESS:  Yes, your Honor.

19             THE COURT:  All right.  Good morning, Mr. Mial.

20             THE DEFENDANT:  Good morning.

21             THE COURT:  You recall that at the final pretrial

22      conference, I asked you a few questions about a plea offer that

23      had been put to you.  And at that time, you told me that it had

24      been communicated to you and you had turned it down.  There's

25      now been some discussion about conversations that occurred

MAH7MIA1 - CORRECT

1    since the final pretrial conference.  I just have a few

2    questions to put to you.

3            Have you been following the conversation I've been

4    having with the lawyers?

5            THE DEFENDANT:  Yes.

6            THE COURT:  And you understand that the government

7    denies that it made a firm oral offer to your counsel after the

8    final pretrial conference, but your counsel believes that it

9    did.  In any event, did your counsel communicate to you that he

10   understood that there was a plea offer available to you at some

11   point soon after the October 3 final pretrial conference?

12           THE DEFENDANT:  Yes.

13           THE COURT:  And your counsel says at first you said no

14   to him, correct?

15           THE DEFENDANT:  Yes.

16           THE COURT:  You need to speak louder.  I'm sorry.

17           THE DEFENDANT:  Yes.

18           THE COURT:  Okay.  Your counsel says that at some

19   point later on he spoke to you and you, in effect, changed your

20   mind and decided that you would like to take that offer; is

21   that correct?

22           THE DEFENDANT:  Yes, I changed my mind.

23           THE COURT:  Mr. McGuinness, when did that occur, in

24   your view?

25           MR. MCGUINNESS:  It was this past Thursday, your

MAH7MIA1 – CORRECT

1    Honor.

2         THE COURT:  Okay.  At that point, Mr. McGuinness, you

3    said you contacted the government to say, in your belief, that

4    this oral offer is still open and you would like to take it?

5         MR. MCGUINNESS:  Yes, your Honor.

6         And for the record, it was the 13th, this past

7    Thursday.

8         THE COURT:  Okay.  Mr. Mial, is it correct then that

9    on the 13th you had indicated to your lawyer that you would

10   like to take that offer, assuming it was still open?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Okay.  At all points, you were the

13   decision-maker, as opposed to Mr. McGuinness, as to what the

14   defense's position would be on a plea offer?

15        THE DEFENDANT:  I was a decision-maker.

16        THE COURT:  Okay.  Mr. McGuinness, is there anything

17   further I should allocute your client to about this?

18        MR. MCGUINNESS:  No, your Honor.

19        THE COURT:  Mr. Bhatia, is there anything further?

20        I appreciate there that there's a difference in

21   opinion between counsel as to the communications, but at the

22   end of the day the relevant inquiry is, you know, there needs

23   to be a meeting of the minds.  There needs to be a signed plea

24   agreement.  There isn't one.  There's no claim here that there

25   was some improper reliance in any way or anything like that.

MAH7MIA1 - CORRECT

1    Sometimes there's a miscommunication.  I'm generously assuming

2    that's all that happened here.

3            Is there anything further I need to do by way of

4    allocution of the defendant?

5            MR. BHATIA:  No, your Honor.

6            THE COURT:  Anything further you want to say on this

7    point?

8            MR. BHATIA:  Your Honor, I think what you've allocuted

9    the defendant on is adequate.

10            THE COURT:  Okay.  Look, I will just state for the

11    record, it's not my business who takes what plea offers, and I

12    don't get in the middle of those.  But I will just note, as a

13    frequent observer of the plea process, that it would be highly

14    anomalous for a binding offer to be conveyed orally.  And it

15    would be especially anomalous with a written offer that had

16    previously been conveyed that carried a written expiration

17    date.

18            So while I do not in any way, shape, or form challenge

19    the sincerity by which Mr. McGuinness claims to have believed

20    that he was receiving a binding plea offer, Mr. McGuinness's

21    perception of surprise that such a thing would happen is shared

22    by the Court.  It's very improbable that experienced

23    prosecutors would be conveying an oral offer like that after a

24    written one had expired.  Much more typical is that the

25    conversations reopened.  But unless and until there's something

MAH7MIA1 - CORRECT

1    in writing, it's not understood to be a written plea offer.

2    I'm just describing that by way of experience.  There's

3    nothing, in other words, here that indicates to me anything

4    like a sharp practice.  It appears that counsel, in good faith,

5    had some miscommunication.

6            With that, turning to our next subject, status of

7    stipulations at the final pretrial conference.

8            Mr. Bhatia, there was some discussion about, in

9    particular, laboratory stipulations and the like.  How did

10   things end up with that?

11           MR. BHATIA:  We have agreed to four stipulations, your

12   Honor.  The stipulations relate to certain of the laboratory

13   reports, Department of Motor Vehicle records, phone extraction

14   records, and phone carrier records, like toll records.

15           THE COURT:  Okay.  Is there an exhibit list that

16   counsel can hand up?

17           MR. BHATIA:  Yes, your Honor.

18           THE COURT:  I'm sorry.  Mr. Smallman tells me my

19   chambers already has it.  Thank you.

20           Given the stipulations, what is the government's

21   current estimate, realistically, of the trial length?  It

22   sounds like you were able to reach the maximum amount of

23   stipulations you were hoping for.

24           MR. BHATIA:  So, your Honor, we didn't come to an

25   agreement on the stipulations that I think would have cut the

MAH7MIA1 - CORRECT

1    number of witnesses.  So we are expecting to call 17 lab

2    witnesses, which I think your Honor called at the last

3    conference a conga line of witnesses.  It's true, they are

4    coming on Wednesday.  We have noticed 17 of those lab analysts

5    to come on Wednesday.  So our expectation is still a lengthy

6    week-long trial.

7              THE COURT:  Will those witnesses all be testifying

8    that the result tested was crack cocaine or cocaine based?

9              MR. BHATIA:  Some of them will be testifying that some

10   of their labs were crack cocaine.  Some of them tested as

11   cocaine because, at the time, the laboratory was only testing

12   those substances for cocaine.

13             THE COURT:  So in other words, given that -- I was

14   prepared to tell the jury that the trial is expected to last

15   four to five days but, in any event, it's expected to be done

16   this week.  That remains accurate?

17             MR. BHATIA:  That's right.

18             THE COURT:  Very good.

19             Mr. McGuinness, any reason to depart from that

20   estimate?

21             MR. MCGUINNESS:  No, your Honor.

22             THE COURT:  Okay.  Next subject involves the proposed

23   jury charge.

24             Mr. McGuinness, I've received one from the government;

25   I've not received one from the defense.  There may be good

MAH7MIA1 — CORRECT

1    reason for that.  These are very familiar charges and nobody

2    has identified, as of yet, any unusual feature of the case.

3    None the less, I note that I haven't received one.  Should I be

4    expecting one?

5         MR. MCGUINNESS:  No, your Honor.  Your Honor has

6    correctly identified why I haven't submitted one.  Pursuant to

7    your Honor's individual practice rules, I didn't submit

8    commonly used instructions because I assumed the Court would

9    use --

10         THE COURT:  Very good.  There it is.

11         Next issue involves the undercover.  Is there any

12    chance that that person will testify today, particularly given

13    that jury selection is unlikely to start until about 10:30?

14         MR. BHATIA:  Yes, I would pin it as likely.

15         THE COURT:  What number witness is the undercover?

16         MR. BHATIA:  The third witness.

17         THE COURT:  Okay.

18         MR. BHATIA:  The first two are relatively short, your

19    Honor.

20         THE COURT:  All right.  Off the record.

21         (Discussion off the record)

22         THE COURT:  Back on the record.

23         All right.  The next issue I have involves the

24    government's letter of yesterday afternoon, docketed at Docket

25    236.  Specifically, the government identifies their information

MAH7MIA1 - CORRECT

1    with respect to certain law enforcement witnesses as to whom

2    either disciplinary complaints or civil lawsuits have been

3    brought.  The government moves to preclude examination of the

4    witnesses on those topics.

5            Mr. Bhatia, let me just get a sense of the time

6    sensitivity of all this.  Are your first two witnesses

7    implicated by this motion?

8            MR. BHATIA:  Yes, your Honor.  So, Officer 1, Officer

9    2, we expect to be our first two witnesses.  And then the NYPD

10   undercover officer could be the third witness.

11           THE COURT:  Is the NYPD undercover one of the -- that

12   person is implicated as well?

13           MR. BHATIA:  Implicated in one lawsuit.

14           THE COURT:  Right.  Okay.  So we do need to resolve

15   this promptly.

16           Mr. McGuinness, is there a controversy here?

17           MR. MCGUINNESS:  Your Honor, if I could just say as an

18   initial matter, I don't understand why we're doing numbers

19   instead of names.  This is all information that's not private.

20           THE COURT:  We're doing it because, if I'm excluding

21   the evidence, there's no need to needlessly tar the name of

22   somebody.  That doesn't promote the search for truth or the

23   resolution of it for me to be referring to the person as

24   Mr. Jones, or whatever his or her name would be, when we can do

25   it that way.

MAH7MIA1 - CORRECT

1          MR. MCGUINNESS:  I'm sorry.  I just don't have the

2     translations to the numbers committed to my memory, so I'll do

3     my best.

4          THE COURT:  Are you telling me you don't know who

5     officer 1, officer 2 and officer 3 are?  You clearly know who

6     the undercover is.

7          MR. MCGUINNESS:  I know who the undercover is.  The

8     government indicated the undercover might be called today.  Is

9     the undercover going to be the first witness?

10          THE COURT:  The government has indicated that the

11     undercover is its third witness.

12          So the sequence here of the issues we need to resolve

13     in terms of the government's motion is officer 1 first, officer

14     2, and then the undercover.

15          I think the undercover will be on the stand,

16     Mr. Bhatia, for quite some time.

17          MR. BHATIA:  That's right.

18          THE COURT:  So what's urgent today is resolving

19     officer 1, officer 2, and the undercover.  If the defense wants

20     to let the issue marinate as to later witnesses, we can take

21     care of that first thing tomorrow.

22          MR. BHATIA:  That would be fine.

23          THE COURT:  All right.  So, Mr. McGuinness, let's just

24     focus on those three people.

25          Are you objecting to what the government seeks here?

MAH7MIA1 - CORRECT

1            MR. MCGUINNESS:  Well, your Honor, I don't have an

2    objection, I'll say at the outset, to the lawsuits being

3    precluded.  I didn't intend on asking about civil lawsuits.

4            THE COURT:  Okay.  So the government's motion to

5    preclude any questioning or other evidence with respect to

6    civil lawsuits is granted as unopposed, correct?

7            MR. MCGUINNESS:  Yes, your Honor.

8            THE COURT:  Okay.  So now turning to internal

9    discipline, I guess is the best way to put the other category,

10   or allegations explored internally, let's focus on officer 1,

11   just to break this down.  That's set out on page 2 into 3 on

12   Docket 936.

13           What's your view?

14           MR. MCGUINNESS:  So, yes, your Honor, I do believe

15   that this is relevant and goes to truthfulness.  I mean, it

16   seems like he was disciplined because his version of events is

17   that he wasn't instructed properly to testify, but that may

18   require -- I think it does require additional questioning to

19   see if that is the truth, that he was just told to testify

20   wrong or he falsified some testimony.

21           THE COURT:  Was there any finding that he falsified

22   anything?

23           MR. MCGUINNESS:  Your Honor, if I can, while I don't

24   see a finding that he falsified something, he received a

25   command discipline for this.

1              THE COURT:  Right.  Sorry.

2              The issue is not whether it is a misstep, but whether

3     it's proper impeachment.  And in that respect, it becomes

4     important whether or not there's a falsity or dishonesty as

5     opposed to some other form of misconduct.  I mean, there's lots

6     of things that an officer can do wrong that are not proper

7     forms of impeachment.  I'm trying to understand.  As to officer

8     1, the allegations were dismissed in administrative

9     proceedings, but he received a command discipline.  And the

10    specifications appear to be that, while on duty, he damaged

11    some property and failed to safeguard property.

12             Is there any way in which that's proper impeachment

13    material?

14             I mean, I'm focusing on the 2020.  I realize there's a

15    2015 episode.  So I guess we have to break those down.  So

16    let's focus on the 2015 episode where the specification was

17    dismissed that he failed to prepare an appearance at the

18    Traffic Violations Bureau.  He was given a command discipline.

19             Let me ask the government, what does a command

20    discipline in this circumstance mean?  The allegations were

21    dismissed.  What was he disciplined for in 2015?  It's a little

22    unclear.

23             MR. BHATIA:  Yes, your Honor.

24             So there are proceedings that can take place at the

25    administrative level in the NYPD; it's sometimes called a

MAH7MIA1 - CORRECT

1    specification or a charge.  And then an officer has the right

2    to contest that.  There can be a short trial.  They can be

3    found guilty or not guilty.

4         In this case, the specification was that he failed to

5    prepare for these court proceedings for which the witness would

6    say, I was mistakenly summoned to go present, and I said I

7    didn't know anything, when he called -- he was called to

8    testify about incidents in which he didn't participate.  So he

9    said, I don't know anything about these incidents.  There was a

10   specification within the NYPD to say that he simply failed to

11   prepare.  Ultimately, that was dismissed because, of course, he

12   did not fail to prepare, he didn't know anything.

13        THE COURT:  So he was as prepared as he could be for

14   something he didn't know anything about?

15        MR. BHATIA:  Precisely.

16        My understanding is, at the precinct level, you can

17   still receive disciplinary -- command disciplines, which are

18   like -- it's instructions.  It's like an official disciplinary

19   action, but it's an instruction at the precinct level.

20        One moment, your Honor.

21        (Counsel confer)

22        MR. BHATIA:  It's an instruction to remedy a failure

23   to conduct police procedure, or policy I should say.

24        THE COURT:  Was there a fact-finding at the precinct

25   level?  Doesn't sound like how precincts work, but what was the

MAH7MIA1 - CORRECT

factual basis, if you will, for such discipline as was imposed
in 2015?

          MR. BHATIA:  Your Honor, I don't think there's
typically a fact-finding procedure.

          THE COURT:  All right.  In 2020, I think you set out
the facts.

          Look, Mr. McGuinness, as to 2015, put this in to rules
of evidence terms, how is that possibly proper impeachment?

          MR. MCGUINNESS:  Your Honor, it's still a little
unclear to me whether the officer is saying, I didn't prepare
because I didn't know anything, if that's actually what
happened.  And then he's disciplined for that.  It seems like
he's being found -- I guess I'm still unclear what the
discipline was for.  For failing to prepare for a hearing and
then he claims that he did prepare because he didn't know
anything -- I'm a little unclear.  I'm sorry, your Honor.

          THE COURT:  Look, I'm going to preclude this.  This is
clearly not proper cross-examination to begin with.  There's no
coherently articulated version of events in which there is some
falsity or dishonesty by the officer.  At most, the allegation
appears to be here that he failed to prepare for something.
While one would always want everybody to prepare well, the
failure to do so is not something that tends to impeach.  On
the other hand, the fact that the officer received any form of
criticism or internal discipline would naturally have a

MAH7MIA1 - CORRECT

1    potentially unfairly prejudicial quality by leading the jury to

2    conclude that an officer who had one prior uncharged bad act

3    was therefore incapable of being honest.  That's not the way

4    Rule 403 works.  Essentially, this is bad character evidence,

5    albeit at a very low level.

6            Beyond that, I would note that the opaque quality of

7    what happened here would mean that if we were to explore this,

8    it would wind up in precisely what Rule 403 counsels against,

9    which is a trial within a trial.  We would be spending time

10   unpacking what exactly happened in 2015 at the precinct level.

11   That's not what this trial is about.

12           So both because this is not proper impeachment

13   evidence and under Rule 403, where I find the capacity to

14   confuse, delay, and unfairly prejudice the government to

15   outweigh the nonexistent probative value of bringing to the

16   fore this evidence, I'll exclude that.

17           Now as to 2020, is there something you'd like to say

18   about that one as to officer 1?

19           MR. MCGUINNESS:  No, not on this incident.

20           THE COURT:  I mean, are you seeking to offer that

21   evidence I guess is the question?

22           MR. MCGUINNESS:  No, I'm not.

23           THE COURT:  Then, look, I will grant the government's

24   motion as to the 2020 episode as to Officer 1 as unopposed.

25   It's also, as set out by the government, persuasive, that is to

1    say the argument to preclude such lines of examination.

2              All right.  As to Officer 2, there does not appear to

3    be any disciplinary incident.  As to Officer 2, the only issues

4    in play are the civil lawsuits that defense counsel has taken

5    off the table.

6              Mr. Bhatia, am I reading that right?

7              MR. BHATIA:  That's correct, your Honor.

8              I'll also note for the Court the footnote on page 4.

9              THE COURT:  Right.

10             MR. BHATIA:  We put that in a footnote.  It's not part

11   of our motion to preclude, so I don't think there's anything

12   else for us to address.  I just don't want your Honor to be

13   surprised.

14             THE COURT:  Sorry.  Just explain to me more concretely

15   about what you're saying about footnote 3 on page 4.

16             Footnote 3 reflects there was a civil lawsuit in a

17   case called *Fuentes*, which the government is not able to obtain

18   records about it.  Separately, though, there are disciplinary

19   actions against officer 2 involving a lab invoice discrepancy,

20   allegations of an unlawful stop and frisk, failure to prepare a

21   stop-and-frisk report; those three things.

22             What is the government's position as to that?  As to

23   the disciplinary parts referred to in footnote 3, are you

24   seeking to preclude any of that?

25             MR. BHATIA:  We're not right now.  I think we'll have

MAH7MIA1 - CORRECT

1    to see how the questioning goes, but we're not seeking to

2    preclude it right now.  It's a little bit of an oddity where

3    there are allegations, which we of course disclosed to the

4    defense.  The witness doesn't have any recollection, really,

5    about two of them entirely, and about one of them, forgetting

6    any disciplinary sanctions for it.  So we'll have to see what

7    defense counsel wants to do with that.  But we're just noting

8    for the Court that if something comes up during cross --

9              THE COURT:  Well, it sounds to me that you're not

10    moving to preclude the defense from examining on any of those

11    three disciplinary actions, the first and third of which

12    involve substantiated allegations, and the middle of which --

13    the second one, the officer is found not guilty in an

14    administrative proceeding but received some form of

15    instructions or training.

16              The government's position is that, as to all three of

17    those, you're not seeking to preclude examination, but

18    depending on how the examination goes, you may seek at some

19    point to move to cut it off.

20              Am I understanding you right?

21              MR. BHATIA:  That's right, your Honor.

22              THE COURT:  Mr. McGuinness, any views on all of that?

23              MR. MCGUINNESS:  No, your Honor.

24              THE COURT:  All right.  Look, there's nothing, then,

25    for me to rule on as to that.  So as to Officer 2, the items

MAH7MIA1 - CORRECT

1    within footnote 3 are, at this stage, fair game for examination

2    at trial.  It's defense's view/position whether or not to --

3    whether it's worth it.

4            So then as to the undercover --

5            MR. BHATIA:  There's just a lawsuit for the

6    undercover.

7            THE COURT:  There's only a lawsuit for the undercover.

8    So there's no motion there?

9            MR. BHATIA:  No, your Honor.

10           MR. MCGUINNESS:  No issue, your Honor.

11           THE COURT:  All right.  And then I guess there are

12   several more officers, Officer 3, Officer 4, Officer 5, and the

13   NYPD's criminalist.

14           Mr. McGuinness, I won't put you to it now.  I realize

15   the letter came in yesterday late afternoon.  Would you prefer

16   to resolve that tomorrow morning or do you want to take it up

17   now?

18           MR. MCGUINNESS:  Yes, if I could resolve it tomorrow.

19           THE COURT:  That's fine.  I'll ask you, then, first

20   thing tomorrow morning what your views are.  And I'll ask you,

21   Mr. McGuinness, to set out right at the get-go what, if

22   anything, within the scope of each of those witnesses' reported

23   disciplinary history you are seeking the right to pursue.  That

24   will narrow the scope of discussion.

25           MR. MCGUINNESS:  Thank you.

MAH7MIA1 - CORRECT

1          THE COURT:  One moment.

2          (Pause)

3          THE COURT:  All right.  With that, I think that

4    exhausted the topics that I came here to raise.  Let me go

5    around the horn to see if there are other issues that counsel

6    have.

7          Mr. Bhatia?

8          MR. BHATIA:  No, your Honor, nothing else.

9          THE COURT:  Defense?

10         MR. MCGUINNESS:  Your Honor, just one minor things to

11   bring the Court's awareness to.  My paralegal, Mr. Kim, has a

12   medical issue that may require him to leave during the

13   proceedings.  He may have to leave early some days and not

14   return.  He will, of course, come and go as unobtrusively as

15   possible.  I just wanted to let the Court know.

16         THE COURT:  Thank you for the heads up.  And I wish

17   you well, Mr. Kim.

18         MR. KIM:  Thank you.

19         THE COURT:  Look, I'm going to take a recess now, but

20   counsel needs to stay close so that as soon as we hear that the

21   jury is coming, everyone is in there seats.

22         I will ask the government to please move those things,

23   which appear to be government exhibits, and to move the cart.

24   If you wish to move the cart into the witness room, that's

25   probably the smartest place for it to be, because it's getting

MAH7MIA1 – CORRECT

1    kind of crowded here.

2              Okay.  Very good.  I'll see you as soon as

3    Mr. Smallman notifies me.  Off the record.

4              (Discussion off the record)

5              THE DEPUTY CLERK:  All rise.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAHQmia2

1          (In open court)

2          THE COURT:  Counsel, the jury is almost here.

3    Mr. Smallman informs me though that counsel may have an

4    application.

5          MR. McGUINNESS:  Yes, your Honor.

6          THE COURT:  Mr. McGuinness.

7          MR. McGUINNESS:  I've taken the Court's word to heart

8    and tried to move this matter towards a resolution.  I believe

9    we've made some progress potentially, but have an odd or

10   unusual application for the Court to inquire or direct the

11   questions of the safety valve.

12         THE COURT:  Have the parties reached a plea agreement?

13         MR. McGUINNESS:  No, your Honor.  It would be an open

14   plea, but prior to doing that, we would want to secure the

15   safety valve.

16         THE COURT:  I'll hear from the government in a moment,

17   but this is happening at breakneck speed.  If you would be

18   asking me to engage in questioning or make some evaluation of

19   the answers without having any appreciation of the context or

20   the tools on which their veracity would be examined, I don't

21   see how I could do that.  I don't understand what you're

22   asking.

23         MR. McGUINNESS:  I guess it would be more to monitor

24   the scope of the questioning, your Honor.  I believe the Court

25   would be in a good position to do that without a full grasp of

MAHQmia2

1    the facts.  I understand --

2              THE COURT:  In other words, what you're proposing is

3    that -- I take it, the application here is to defer the

4    beginning of jury selection, that's ultimately what you're

5    asking, in the hope that some agreement can be worked out.  The

6    jury is going to be here momentarily.

7              MR. McGUINNESS:  Yes, Judge, it would be a short

8    adjournment to see if we can work out a safety valve.  In the

9    event that the safety valve went through successfully, we could

10   avoid the entire trial.

11             THE COURT:  Mr. Bhatia, what's the government's view

12   about this?

13             MR. BHATIA:  Your Honor, defense counsel sort of

14   brought this up to us in the last few minutes before your Honor

15   came out.  I think we'd like to have the benefit of conferring

16   about it a little more, not a long time, but if we could have

17   five or ten minutes to think about it, that would be helpful

18   and I think helpful to the Court.

19             THE COURT:  Let me see if I understand even what the

20   process is that's being discussed here.  Nobody is representing

21   to me that the parties are anywhere close to a plea agreement.

22   There's no suggestion that the government is relenting on its

23   insistence on a plea to the (b)(1)(A) or whether to a (b)(1)(B)

24   or (b)(1)(C), there is no suggestion of that.

25             The suggestion is that the defendant would be making

MAHQmia2

an open plea to the entire indictment, or at least Count One,

whatever the case may be, presumably the entire indictment, but

the defendant's willingness to do that is conditioned on

whether the Court in hearing the safety valve proffer would

agree that the prerequisites of it are met.

      Mr. McGuinness, am I basically hearing it right?

      MR. McGUINNESS:  Yes, your Honor.  I'm afraid to say

there is one other complication.

      THE COURT:  Let's start with the first complication.

      MR. McGUINNESS:  Yes, Judge.

      THE COURT:  The government has not had the opportunity

to prepare for this.  Suppose there is something that your

client says that is, on reflection, inaccurate or untruthful or

disqualifying.  Where are we then?

      It would be one thing to say we'd like an adjournment

until tomorrow morning so that the defendant can do a safety

valve proffer through the government.  If the government is in

a position to represent with its superior information that

based on the information presently known, the safety valve is

qualified for, that would be another story.

      But the government is in a much better position than

the Court is, and I would be very uncomfortable in the crucible

to make some finding that may well be overtaken by later

considered information.

      MR. McGUINNESS:  Yes, your Honor.  I mostly am

MAHQmia2

1    appealing to the Court's narrative scope of the questioning.

2    I'm concerned that there are differences in factual views

3    between my client and the government's case, and I think a

4    safety valve can be achieved without treading into those areas,

5    and I think the most effective way to do that would be with the

6    guidance of the Court.

7         THE COURT:  So, in other words, you would not be

8    asking for the Court to make any assessment of credibility, but

9    rather to assess -- to set limits so that the government in

10   your view doesn't overstep as to areas of relevant question.

11        MR. McGUINNESS:  That's correct, your Honor.

12        THE COURT:  Mr. Bhatia.

13        MR. BHATIA:  Your Honor, the scope is laid out in

14   Section 3553(f)(15).

15        THE COURT:  All right.  Which requires, among the

16   requirements for the safety valve, that:  "Not later than the

17   time of the sentencing hearing, the defendant has truthfully

18   provided to the government all information and evidence the

19   defendant has concerning the offense or offenses that were part

20   of the same course of conduct or of a common scheme or plan."

21        That is the scope.

22        Mr. McGuinness, I'm loathe to get in the middle of

23   that.  It would be one thing if you were in the middle of the

24   proffer, and there was something that was really out of bounds

25   that was being asked, but usually the safety valve is done by

MAHQmia2

 1    the executive branch with the defendant and not by the judicial

 2    branch.

 3              May I ask you, is there some area of questioning that

 4    you believe would be out of bounds?  Maybe there's no dispute

 5    here.  What are you worried about?

 6              MR. McGUINNESS:  Obviously, this is a conspiracy

 7    involving many people, your Honor, and I am concerned

 8    questioning about people that may or may not be relevant.

 9              THE COURT:  Are you concerned about questioning about

10    any of the people who are named in the indictment?

11              MR. McGUINNESS:  Your Honor, I think potentially

12    questions that are outside of my client's involvement or

13    knowledge in the conspiracy, I'm concerned about going into

14    those areas.

15              THE COURT:  Look, at the end of the day, your client's

16    obligation is to be truthful, but it's hard for me to see how

17    questioning within the scope of the charges as returned by the

18    grand jury would be out of bounds.

19              The government may or may not agree with or be

20    prepared to credit what your client is saying is truthful, and

21    that's a risk you run, but I don't see how -- if what you're

22    saying is you're going to raise questions about the government

23    asking about the conduct charged in the indictment by

24    co-conspirators, how do you have a leg to stand on given the

25    text of requirement 5?

MAHQmia2

1           MR. McGUINNESS:  Well, I wouldn't object to questions

2      that are about that, your Honor, about things that are within

3      my client's knowledge.

4           THE COURT:  That doesn't -- that's no limitation

5      because there are presumably things within your client's

6      knowledge that are out of bounds.

7           The issue here is -- look, I mean, to the extent that

8      the notion is that on the fly we can delay the jury trial so

9      that you can come up with a somewhat unorthodox approach here,

10     I'm not in favor of it.  If you feel that the -- if the parties

11     feel that a plea is in the offing, as long as a successful

12     safety valve proffer can be done today, I will consider putting

13     off the jury trial until tomorrow, but only if I'm getting both

14     parties telling me that that sounds like where we're at.

15          (Pause)

16          THE COURT:  Mr. McGuinness, where are we?

17          MR. McGUINNESS:  I think we should proceed with jury

18     selection.

19          THE COURT:  All right.  Government, any disagreement?

20          MR. BHATIA:  No.

21          THE COURT:  Look, I will simply say this:  I cannot

22     get in the middle of your discussions.  I would encourage you,

23     either at the lunch break, assuming one, or at the end of the

24     day, to take advantage of the more measured environment to see

25     if there's a place in which the case can resolve itself.  But

MAHQmia2

1    you should not be expecting me to get involved in that, and the

2    process of having me audit a safety valve proffer seems to me

3    irregular and unnecessary here.

4          Counsel have, no doubt, been party to many safety

5    valve proffers and probably have an intuitive understanding as

6    to the proper scope, but I'm not going to be supervising that.

7    I do encourage you to keep talking, but at this point with

8    nobody representing that a plea is imminent, we need to move on

9    with the jury trial.

10          Anything do before Mr. Smallman gets the venire?

11          MR. BHATIA:  No, your Honor.

12          MR. McGUINNESS:  No.  Thank you.

13          THE COURT:  Let's get the venire.

14          (Jury selection followed)